Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 806-9663
chd@fergusondurham.com
ISB No. 6428

Attorney for Defendant Watson

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>v.<br><br>TYLER JAY WATSON,<br><br>               Defendants. | Case No. 1:22-cr-00149-BLW<br><br><br>**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS AND EVIDENCE** |

### INTRODUCTION

The Government has charged Tyler Watson with one count of possession of

more than 400 grams of fentanyl with the intent to distribute. Dkt. 1. Mr. Watson here

moves to suppress his statements and the physical evidence found in his car and at his

grandmother's home on Nez Perce Road in Caldwell.

Mr. Watson's Fourth and Fifth Amendment rights were violated after a traffic stop on June 7, 2023. Nampa Officer Jared Scott violated Mr. Watson's Fourth Amendment rights when he unlawfully prolonged a traffic stop to determine whether Mr. Watson was on parole and whether his parole officer wanted him detained and searched. Mr. Watson's Fifth Amendment rights were violated because he did not knowingly and voluntarily waive his privilege against self-incrimination and, further, because his incriminating statements were coerced and involuntary.

## FACTUAL BACKGROUND[1]

<u>The Police Stop Watson Allegedly Based on Watson's Failure to Signal a Turn</u>

Around noon on June 7 of last year, patrol officer Jared Scott was working his shift on or near Midland Road in Nampa. Ex. D (Scott Narrative Report). Another Nampa officer, Detective Huston, radioed Officer Scott to tell him that he (Detective Huston) had just witnessed a maroon Scion sedan make a turn without using its turn signal. *Id*. Huston instructed Scott to pull the car over. *Id*. Scott did so on a residential side street. *Id*. It is unclear what else, if anything, was said between Scott and Huston as Scott did not include that in his report. *Id*.

As Officer Scott approached the car, he radioed dispatch to "have a canine

---

[1] These factual allegations are drawn primarily from the discovery that Watson has received so far.

available." Ex. H 00:10 (Scott body cam recording). Tyler Watson was the driver and sole occupant of the car. *Id*. Scott told him that he had pulled him over because he "didn't use his blinker back there when [he] was pulling on to Midland." Ex. H, 00:11. Scott asked Watson for his driver's license, which Watson provided. *Id*. After a brief exchange about whether Watson had failed to indicate a turn, Scott asked Watson for his insurance and vehicle registration. *Id*.

Scott then said, "while you're gathering all that, man, just a few questions for you." Ex. H, 00:40-42. He asked Watson if he had any guns, knives, or weapons in the car. *Id*. at 00:42-43. Watson said that he did not. *Id*.

As Watson handed his registration and insurance paperwork to Scott, Scott then asked him if he was on probation or parole. Ex. H, 00:45-46. Watson admitted that he was on parole. *Id*. Scott followed up with, "what for," to which Watson said, "possession." *Id*. at 00:50-51. Scott asked, "you [sic] been staying clean?" *Id*. Watson said he had. *Id*.

Continuing with questions along those lines, Scott next asked Watson whether he had any active warrants – Watson replied that he did not – before Scott asked him "anything in the vehicle [unintelligible] drugs that a canine would alert to?" Ex. H. Again, Watson said "no." *Id*.

At that point, Scott told Watson to wait while he went back to his patrol car. Ex. H. Once in his car, Officer Scott called Detective Huston, who told him to detain Watson

and to search his car "on behalf of P & P." [2]  Ex. G (Scott's car cam recording).

Scott went back to Watson's car, telling him that "I just spoke to your parole officer and he wants the vehicle searched." Ex. H, 3:20-21. At Scott's direction, Watson got out of his car. *Id*. Scott patted him down, handcuffed him, and put him in the back of his patrol car. *Id*.

Scott began searching Watson's car before a parole officer was present. Ex. G, H. He found some empty syringes inside the driver's side door storage area. Ex. D. He also noted "two stacks" of cash in the center console of "varying value," and cash in a wallet on the passenger side. *Id*.

About four minutes into the search, Idaho Probation and Parole agent Steve Landers arrived. Ex. H, 11:09. Agent Landers, who was not Tyler Watson's supervising officer, began to assist Scott in the search of Watson's car. Ex. G, H. After a few minutes, Landers went to Scott's patrol car and spoke with Watson, who was still handcuffed in the back seat. Ex. G.

Landers did not inform Watson of his *Miranda* rights before talking to him. He instead told Watson that "after we're done searching your vehicle, we're going to take you back to your house and we're going to search your house." Ex. G, 15:11-13. He also asked, "what are we going to find in the car?" *Id*. at 15:44. Watson said that they would

---

[2] For some reason, Officer Scott muted his body cam during this telephone call, Ex. H, but the car's video system picked up and recorded the conversation. Ex. G.

not find anything other than syringes. *Id*. at 15:54. Landers asked him why syringes were in the car, to which Watson responded that they were his "friend's" syringes, and they were in his car because she couldn't keep them at a halfway house. *Id*.

Watson's supervising officer, Chance Nicholas, eventually showed up at the scene. Ex. E, p. 5 (Coronado Report.) He, too, spoke with Watson while he was handcuffed in the back seat of the patrol car. *Id*. According to Nicholas, "Watson provided [him] with the passcode" to his cell phone. *Id*.

Three officers thoroughly searched Watson's car. Ex. G, H. About ten minutes into the search, Officer Scott found two small magnetic black boxes underneath the driver's side door attached to the frame of the car. Ex. D. Within those boxes, he saw plastic bags containing white powder, small blue pills, and smaller bags. *Id*. The pills and the powder later tested positive for fentanyl. *Id*.

The officers decided to search Watson's current residence where he lived with his mother and another adult. Ex. E. Additional law enforcement officers arrived at the home, including DEA agents. *Id*. One of those officers was Nampa Detective Mike Coronado with the Treasure Valley Metro Violent Crimes Task Force. *Id*.

The parole agents searched the common area of the home where Watson slept. Ex. E, pp. 2-3. They did not find anything incriminating. *Id*. Watson's supervising agent decided to return to his office. Ex. E, p. 5. He informed the officers that if "they decided to search [Watson's] grandmother's house," he "would meet them there." *Id*.

<u>The Patrol Car Interview</u>

Detective Coronado decided to interview Watson after they failed to find anything at his mother's home. Ex. E. He opened the back door of Scott's patrol car, where Watson had been in custody now for more than an hour. Coronado was accompanied by another agent, and multiple armed officers mingled in the area.

According to Coronado, he read Watson his *Miranda* rights off a card, and Watson agreed to talk to him. Ex. E. Although Coronado recorded other aspects of his interactions with Watson that day, he did not record this interview. Nor is there any explanation in the current discovery detailing precisely what Coronado read to Watson about his rights, what Watson said to him in response, or generally how that exchange went. One of Watson's parole conditions, moreover, is that he must be "truthful" and "cooperate" with all requests from "probation/parole officers," who by the time of this interview had already interrogated Watson and were fully involved in the search and seizure activity. Ex. A (IDOC Agreement of Supervision).

Coronado next asked Watson whether drugs could be found at Watson's grandmother's home. Ex. E. Watson told him that there were drugs hidden there and he would show them where they were. *Id*.

The entourage moved on to Watson's grandmother's home on Nez Perce Road in Caldwell (the "Nez Perce home"). Watson had lived in this home off and on for much of his life, as recently as a few months before his arrest. Ex. F, ¶ 5 (Declaration of Tyler

Watson). He was still a daily visitor with a key. *Id*. He had a room within the home, and

he had access to all parts of the home, including the garage. *Id*.[3]

Once there, Detective Coronado spoke with Watson's grandmother, telling her

that Watson had left some things in the garage that should not be there. Ex. J-2

(Coronado audio). She gave them a key, which they used to open the garage. *Id*.

Coronado went back to Watson and asked him where the "stuff is in the garage." Ex. J-

1. As part of that brief conversation, he said, "once we're back at the police department

we'll sit down and have a talk." Ex. J-1.

Officers then brought Watson into the garage, and he showed them where drugs

and other contraband were hidden within a separate, walled-off storage space in the

garage. Watson and his grandmother treated this as Watson's space where he stored his

personal items within the home. Ex. F, ¶ 8. It was in this area that Watson directed law

enforcement to over 4,000 grams of fentanyl, some methamphetamine, cash, and

associated drug paraphernalia, which form the basis of the current federal charge

against him.

<u>The Police Station Interview</u>

After the officers had finished seizing the evidence, Officer Scott drove Watson to

---

[3] Watson offers his declaration, Exhibit F, solely so he can exercise his constitutional
rights in this motion to suppress. It cannot be used as substantive evidence against him.
*See Simmons v. United States*, 390 U.S. 377, 389-94 (1968) (holding that when a defendant
testifies in support of a motion to suppress evidence, his testimony may not be
thereafter admitted against him at trial on the issue of guilt.).

the Nampa Police Department where he was put in an interview room. Eventually, Detective Coronado and two other task force officers came into the room. Coronado began by telling Watson that they "were going to go over some details we already kind of talked about a little earlier." Ex I, 31:55 (interrogation recording). He explained that they were involved in a drug investigation and knew the major players, but that they "want to know how you got involved with them and it just kind of kick it off from there." Ex I, 31:13.

Then, Coronado addressed Watson's Fifth Amendment rights by referring to whatever had happened in the patrol car earlier:

> Before you begin, you remember your *Miranda* rights, right? I provided this to you earlier today when we were talking in the car, correct? Okay so you remember all that and that's not going to change anything. What we talked about in the car, it still applies. When we go to the prosecutor about your cooperation. This is all taken into consideration for the charges that you have pending. Okay, that make sense?

*See* Ex. I, 31:24-47

Watson expressed concern about whether the information he told them would be put into any reports. Ex. I. Coronado replied that "there's a way to kind of protect that, right, but essentially what you're telling me is at the end of the day discoverable, but all those people have their own separate charges." Ex. I, 32:00. The officers explained that it needed to be documented because if it was not documented, according to Coronado, "it's not consideration" that they could give to the prosecutors. *Id*. Another officer told

him "we do have to document it in order for the prosecutors to see what you've done."
Id. at 32:10. Over the next hour, Coronado interviewed Watson, who made several
incriminating statements. *Id*.

Watson now moves the Court to exclude from trial all evidence that law
enforcement seized on June 7 in violation of his Fourth and Fifth Amendment rights.

## ARGUMENT

### I.

**Officer Scott unreasonably prolonged the traffic stop, which was allegedly based on the failure to indicate a turn, to determine whether Mr. Watson was on parole and whether Mr. Watson's parole officer wanted him detained and searched. This delay violated Mr. Watson's Fourth Amendment rights.**

A.     Standard of Law

The Fourth Amendment protects the people to be free from "unreasonable
searches and seizures." U.S. CONST. AMEND. IV. "Warrantless searches and seizures are
presumed to be unreasonable unless they fall within a few specifically established and
well-delineated exceptions." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). The
Government bears the burden of justifying a warrantless search or seizure. *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991).

A seizure for a traffic violation based on reasonable suspicion justifies a police
investigation of that violation. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). A

traffic stop is intended to be "a relatively brief encounter," that is "more analogous to a so-called '*Terry* stop' ... than to a formal arrest." *Id*. (citations omitted). The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission,'" which is "to address the traffic violation that warranted the stop," and to attend to related safety concerns. *Rodriguez*, 575 U.S. at 354 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). A traffic stop may "last no longer than is necessary to effectuate th[at] purpose." *Id*.

B.        Discussion

Watson does not dispute that Officer Scott had reasonable suspicion to stop him based on Detective Huston's claim that Watson had failed to indicate a turn. According to *Rodriguez*, Scott had the authority to address that traffic violation. This would include "checking the driver's license, determining whether there are any outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." 575 U.S. at 355. Any detention beyond the time it would take to complete those tasks, in the absence of additional and independent reasonable suspicion, would violate the Fourth Amendment.

Yet Scott extended the duration of the traffic stop by asking a series of questions that were unrelated to the alleged violation, including whether Watson was on parole, why he was on parole, whether he had been staying clean, whether he had any drugs in the car, and whether he had any weapons in the car. *See, e.g., United States v. Mati*, 466

F.Supp.3d 1046, 1056 (N.D. Cal. 2020) (holding that "asking a driver whether he is on probation and has a search condition" is unrelated to a routine traffic violation and "is, instead, intended to uncover evidence of criminal activity."); *accord United States v. Hoover*, 2022 WL 623951, at *12 (D. Nev. 2022) (collecting cases). Scott's questions were not tied to what Scott claimed was the mission of the stop, which was to investigate and perhaps cite Watson for his failure to indicate a lane change.

Scott further extended the stop by delaying the processing of the traffic violation when he called Detective Huston to inquire whether Probation and Parole wanted Watson detained and searched. *See United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (citing *Rodriguez* to find that an ex-felon registration check unreasonably prolonged what was supposed to be an unsafe lane change traffic stop). When he asked the unrelated questions or made the phone during this incident – the chronology of the events – is not material, because "what mattered is the added time, not at what point in the stop the time was added." *United States v. Landeros*, 913 F.3d 862, 866 (9th Cir. 2019). And it "does not matter that the time added was relatively short." *Mati*, 466 F.3d at 1058.

The Court should find persuasive guidance in *United States v. Mati*, 466 F.Supp.3d 1046 (N.D. Cal. 2020), which applied *Rodriguez* to factual circumstances similar to those here. There, two police officers were patrolling in the Tenderloin district of San Francisco in the late evening when they saw a GMC Yukon driving at a high rate

of speed before making an abrupt stop. *Id*. at 1050. One of the officers ran a records check and discovered that the Yukon's registration was expired. *Id*. By then, the Yukon was parked with the driver's side door open, and Tei Mati, the eventual defendant, was standing next to the door. *Id*. Mati gave one of the officers his license, and that officer returned to the patrol car. *Id*.

While he was in the car, the second officer asked Mati whether he was on probation or parole. 466 F.3d at 1050. Mati responded he was on probation. *Id*. The officer asked him what he was on probation for, and Mati said that it was a weapons charge. *Id*. The second officer, questioning Mati by the door of the Yukon, instructed the first officer in the patrol car to run a check on whether Mati had a "search condition," meaning a search waiver. *Id*. The first officer found that Mati did have a waiver, which prompted the officers to then search the Yukon, finding an unlawful sawed-off shotgun. *Id*. at 1051. Mati waived his *Miranda* rights and told the officers that he had been taking the shotgun to a particular storage locker. *Id*. at 1052. Officers went to the locker and found, among other things, shotgun shells, a cross-bow, a rifle scope, and a tactical vest. *Id*.

The court ordered all of the incriminating evidence suppressed. 466 F.3d at 1056-57. The court concluded that the original encounter was supported by reasonable suspicion of a traffic code violation, but the police had unlawfully extended the stop by inquiring into Mati's probationary status and determining whether he had a Fourth

Amendment waiver. *Id*. at 1058-59. The relatively short duration of the time that the officers detained Mati did not matter; any additional time to explore matters unrelated to the stop was unwarranted and therefore unreasonable under the Fourth Amendment. *Id*. at 1059. It turns out Mati did have a Fourth Amendment waiver, but the district court held that it did not retroactively authorize the prolonged detention because these officers did not know Mati had a waiver while they detained him to investigate the issue. *Id*.

*Mati* is similar to this case. Officer Scott claimed to have stopped Watson because he "didn't use his blinker back there when [he] was pulling on to Midland." Ex. H, 00:11. Scott confirmed this in his police report, where he wrote that the sole reason for the stop was a failure to indicate a turn. Ex. D. Scott's questioning Watson about his parole status, whether he had weapons in the car, and whether he had drugs in the car, is unrelated to Watson not using his "blinker back there." *See Rodriguez*, 575 U.S. at 357 ("[o]n-scene investigation into other crimes, however, detours from [the mission to ensure roadway safety]"). Calling Huston to inquire about whether Probation and Parole wanted Watson detained and searched was also unrelated to the reason for the stop. These inquiries prolonged the seizure, even if briefly. *See id.* at 357 (noting that what is important is whether the unrelated detention "'prolongs'—i.e., adds time to— 'the stop.'"). As in *Mati,* the increased detention was unreasonable under the Fourth Amendment.

Additionally, Scott's decision to handcuff Watson and put him into his locked patrol car while he conducted a lengthy search turned this into a full-blown arrest for which Scott had no probable cause. *See Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020) (Finding that "a reasonable individual in Reynaga's position would not have felt free to leave after being blocked from entering the courtroom, handcuffed, taken outside, and placed in Skinner's patrol vehicle."). This adds to the unreasonableness of the encounter.

* * *

The Government may try to shift away from what Officer Scott told Watson about why he stopped him, and what every officer wrote in their report, to argue that Watson was really the target of a drug investigation when he was pulled over. The Government may claim that the prolonged detention was reasonable based on those suspicions. The Court should not be persuaded.

True, the discovery that the Government has provided to the defense suggests that DEA agents suspected that Watson was potentially working for a drug dealer that they were investigating. Agents had stumbled on Watson's phone number, and some text messages from his number to the suspected dealer when they executed a wiretap warrant for the dealer's phone. A DEA agent also received a generalized tip from an unidentified source that Watson was distributing fentanyl and methamphetamine. Detective Coronado indicates in his report that Watson was under surveillance the day

he was stopped. Ex. E.

Whatever else might be said about this information, however, Officer Scott had no probable cause or reasonable suspicion to believe that Watson possessed drugs *in his car at the time he was pulled over around noon on June 7* on a quiet residential street in Nampa. *Cf. United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) (noting that "[o]fficers may conduct a warrantless search of an automobile, including containers within it, when they have probable cause to believe that the vehicle contains contraband or evidence of criminal activity."). And no articulable suspicion developed while Scott interacted with Watson in his car.

This is surely why the officers have relied exclusively in their reports on the failure to indicate a turn as the basis for this traffic stop. Coronado writes that "Scott conducted a traffic stop on WATSON for failing to use a turn signal." Ex E. Scott clearly indicates that was the reason as well. Ex. D. For the officers to claim now that the turn signal violation was a pretext to fish in Watson's car for evidence of criminal drug activity would undermine their credibility.

The Government may also point to Watson's parole condition where he allegedly gave advance consent to searches of his vehicle by "any agent of IDOC or law enforcement officer." Ex A, p. 1. But there is no evidence that Officer Scott *knew* Watson had signed a parole search waiver – or even knew for sure that he was on parole – before he stopped Watson and started questioning him. That is the information that

Scott was trying to confirm with the delay. Also, Watson did not consent as part of his parole conditions to a prolonged *seizure* of his person by a police officer while that officer waited to get the okay from Probation and Parole for a parole *search*, which is what happened here. Ex A.

And, finally, the Government might simply resort to *Samson v. California*, 547 U.S. 843 (2006). In *Samson*, the United States Supreme Court upheld a police officer's suspicionless search of a parolee. *Id.* at 857. In reaching that holding, the Court concluded that parolees have diminished expectations of privacy relative to the general public. *Id.* at 849-50.

Even post-*Samson*, however, the Ninth Circuit has held that police officers must have advanced knowledge of a parole search condition if they are going to justify a search on that ground. *E.g.*, *United States v. Caseres*, 533 F.3d 1064, 1075-76 (9th Cir. 2008) (citing *Samson*, 547 U.S. at n.5, for the proposition that an officer who lacked prior knowledge of search condition would be acting unreasonably in searching a parolee).

In *Caseres*, that the officer knew before the search that the defendant was on parole was insufficient. The Government there had failed to show that the officer knew the details about the defendant's parole and any search conditions, such as "when, [and] in what state, Caseres committed the crime for which he was paroled." *Id.* at 1076. Watson expects that also to be true here. Based on the evidence currently available to Watson, Officer Scott did not know the details of his parole, including whether Watson

had signed a search waiver, when he delayed the traffic stop. As in *Caseres*, *Samson* does

not retroactively make the prolonged detention lawful.

Because the traffic stop was unreasonably extended, all evidence that the agents

discovered after that, including all physical evidence and all of Watson's statements, are

products of the initial unlawful seizure. *Wong Sun v. United States*, 371 U.S. 471, 488

(1963). The Court must exclude them as tainted by the Fourth Amendment violation.

## II.

**Mr. Watson did not knowingly and voluntarily waive his Fifth Amendment rights**
**before he was questioned, and his subsequent incriminating statements were coerced**
**and involuntary. The discovery of the physical evidence at the Nez Perce Road home**
**was a direct result of these compelled statements, and that evidence must also be**
**suppressed.**

A.    <u>Standard of Law</u>

 The Fifth Amendment privilege against self-incrimination provides that "[n]o

person ... shall be compelled in any criminal case to be a witness against himself." U.S.

CONST. AMEND. V. Given that custodial interrogations are inherently coercive, police

officers must first warn a detained suspect about his rights under the Fifth Amendment.

*Miranda v. Arizona*, 384 U.S. 436 (1966). In particular, officers must inform the suspect

that he has a right not to talk to them, a right to an attorney, and that any statements he

chooses to make can be used against him in court. *Id.* at 460. "Any statements obtained

during custodial interrogation conducted in violation of [*Miranda's*] rules may not be admitted against the accused, at least during the State's case in chief." *Fare v. Michael C.*, 442 U.S. 707, 718 (1979).

Additionally, a statement from an accused is admissible in evidence only if it was freely and voluntarily made. *Colorado v. Connelly*, 479 U.S. 157, 163 (1986). Involuntary confessions violate due process. *Id*. An inculpatory statement must be the product of both a rational intellect and free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).

The Government bears the heavy burden to show that the defendant knowingly, voluntarily, and intelligently waived his Fifth Amendment rights and that his subsequent confession is voluntary. *J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011). This involves a factual inquiry into the totality of the circumstances. *United States v. Doe*, 819 F.2d 206, 209 (9th Cir. 1985).

B.      Discussion

An inflection point in this investigation was when Detective Coronado's decided to interview Watson while he was detained in the back of Officer Scott's patrol car. By then, officers had found what appeared to be fentanyl in two small black boxes attached to the underside of Watson's car, with some cash and empty syringes. They came up empty, however, when they searched Watson's residence. Watson's supervising parole agent had even decided to return to the office, notifying the others that "if they decide to search Watson's grandmother's house," Ex. E, p. 5, he would meet them there.

18

It appears that officers did not have much to go on as to whether contraband could be found at the Nez Perce home. Watson had not lived there for several months. Ex. F. They needed more, so Detective Coronado decided to question him. Watson had been in custody for about an hour. He was still handcuffed and in Scott's patrol car. There is no question he was "in custody" for purposes o*f Miranda*.

Notably, before Coronado's interview, parole agents Landers and Nicholas had already questioned Watson without first offering any *Miranda* warnings. Ex. E, pp. 3-5. At the scene of the traffic stop, Landers made declaratory statements to Watson suggesting that Watson had no choice in the matter: "after we're done searching your vehicle, we're going to take you back to your house and we're going to search your house." Ex. G, 15:11-13. He also asked, "what are we going to find in the car?" *Id*. at 15:44. They briefly discussed the discovery of syringes.

At this point, Watson was completely under the control of the parole agents and the investigating task force officers. No one had yet read him his rights to tell him that he could choose not to speak to them. The compulsion was strong.

But there was even more than that. Watson was subject to a parole condition that required him to "cooperate with the requests of [his] probation/parole officer." Ex. A, p. 1. "Cooperation" included "being truthful." *Id*. "Being truthful" necessarily meant answering any questions put to him. If Watson did not comply with that condition, his failure to "abide by and conform to [his conditions]" could result in parole revocation

proceedings. *Id*. at p. 2. After IDOC parole agents had arrived on the scene, they were jointly involved with task force agents throughout the investigation. In addition to questioning Watson, Agent Landers searched Watson's mother's home. Supervising Agent Nicholas was present during the search of Watson's mother's home and, presumably, at the search on Nez Perce.

For these reasons, Watson was put into a "classic penalty situation," where if he choose *not* to speak with the officers – invoking his Fifth Amendment right – he would violate the very first condition of his parole and face the loss of liberty on that ground. This case is similar to *United States v. Saechao*, 418 F.3d 1073, 1075 (9th Cir. 2005), in which the Ninth Circuit concluded that unwarned statements to a probation officer were compelled by a probation condition. In *Saechao*, the Ninth Circuit held that the "Fifth Amendment proscribes the use in a separate criminal proceeding of a statement obtained pursuant to a probation condition that requires a probationer 'to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" *Id*. at 1081 (citing *Minnesota v. Murphy*, 465 U.S. 420, 436 (1984)).

These were the circumstances in which Watson found himself when Detective Coronado opened the door and started to speak with him. Coronado memorialized this encounter by writing that he "spoke to WATSON and read WATSON his Miranda Rights directly from a Miranda Warnings card. WATSON stated he understood and wanted to speak  with TFO Coronado." Ex E.  That is the entirety of the alleged waiver

currently in the record. Nothing else about the exchange regarding Watson's Fifth Amendment rights is in any report, including what Coronado read off of his "*Miranda* warnings card," how he read it, or what else he may have said to Watson before and after. Oddly, this critical interaction is not recorded by audio or video. Many other parts of the investigation that day are recorded. And there is no written and signed waiver in the record. The circumstances were already coercive, and Watson was compelled by a parole condition to speak. The record is devoid of the specifics of Watson's understanding of his right not to talk or to have an attorney present.

In short, the Government cannot carry its burden to establish that Watson's decision to talk to Detective Coronado while in the patrol car and admit that he stored drugs in the garage on Nez Perce was knowing and voluntary and an intelligent product of his free will. Those statements must be excluded.

The much more detailed confession that Watson made at the police station is equally infirm. Detective Coronado did not *Mirandize* Watson before that interview. Instead, he started by introducing another agent. He said that they were going "to go over some of the details that we already talked about earlier. Ex I, 30:44-46. He told Watson that he knew about some of the distributors and the "entire organization, essentially." *Id*. He told Watson that he knew that he was "getting product from Noy, who was getting the product from a California source." Ex. I, 31:04. He then mentioned, off-hand, "[b]efore we begin, you remember your *Miranda* rights, right? I provided this

to you earlier today when we were talking in the car, correct? Okay so you remember all that." *Id*. He did not say what those rights were. Instead, he followed that up quickly by telling Watson "that's not going to change anything" and that "what we talked about in the car, that still applies," meaning that when the officers talk to the prosecutor about Watson's "cooperation, this is all taken into consideration for the charges that you have pending." *Id*.

Watson was concerned whether anything he said would get back to others. Though the agents told him that it would be "documented," they couched that in terms of showing the prosecutor his cooperation so it could be taken into consideration. Then, prompted by the agents' questions, Watson made a lengthy statement detailing his involvement in the drug trade.

This interview had no fresh warnings, and the Court should suppress it as well. All the coercion of the patrol car interview still existed. Even if Detective Coronado had *Mirandized* Watson, it would have been ineffective to stave off the exclusion of this evidence. *See Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (holding that a two-step interrogation tactic of unwarned questions that result in a confession followed by *Miranda* warnings and new questions that produce the same incriminating statements is unlawful).

The remaining question is whether the Court must suppress the physical evidence found at the Nez Perce home as a derivative of the Fifth Amendment violation

flowing from Detective Coronado's patrol car interview. The Supreme Court has held that non-coerced statements after a technical *Miranda* violation do not require suppression of physical evidence statements. *United States v. Patane*, 542 U.S. 630, 643-44 (2004) (plurality opinion). But, the Fifth Amendment does require the exclusion of physical fruits from involuntary statements. *See Patane*, 542 U.S. at 640 ("We have repeatedly explained 'that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.'" (quoting *Chavez v. Martinez*, 538 U.S. 760, 769 (2003)).

Here Watson's statements in the patrol car and immediately thereafter were involuntary and coerced. It was those admissions that prompted the officers to travel to Nez Perce and ask for permission to search the garage. Watson's admissions led them to precisely where the contraband was. The discovery of this physical evidence was directly tied to the violation of Watson's Fifth Amendment rights. That evidence must also be suppressed.

## CONCLUSION

Tyler Watson respectfully contends that officers violated his Fourth and Fifth Amendment rights and that all evidence that they seized as a result of those violations must be suppressed.

Dated this 6th day of March 2023.

Respectfully submitted,

/s/ Craig H. Durham
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 6, 2023, I filed the foregoing electronically through

the CM/ECF system, which caused the parties or counsel to be served by electronic

means, as more fully reflected on the Notice of Electronic Filing:

David Morse
david.morse@usdoj.gov

Attorney for the United States

/s/Craig H. Durham