JOSHUA D. HURWIT, STATE BAR NO. 9527
UNITED STATES ATTORNEY
DAVID J. MORSE, STATE BAR NO. 10066
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83702-7788
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TYLER JAY WATSON,<br><br>Defendant. | Case No. 1:22-cr-00149-BLW<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS** |

## INTRODUCTION

The Government opposes Defendant's motion to suppress (ECF No. 22 and 22-1.) Defendant's traffic stop was not impermissibly prolonged. The stop was justified by both an observed traffic violation and independent reasonable suspicion. Additionally, Defendant was not coerced into making incriminating statements when he met with TFO Coronado, DEA Special Agent Aaron Ferguson, and DEA Intelligence Analyst Shelly Hall. He was given his Miranda warning and could have declined to speak with investigators. Instead, he knowingly and voluntarily provided information about the location of four and a half kilograms of fentanyl and

admitted his role in a large drug trafficking organization. For these reasons, the Government respectfully asks the Court to deny Defendant's motion to suppress.

## FACTUAL BACKGROUND

In May 2022, the DEA obtained a Title III Wiretap (wiretap) authorizing the interception of wire and electronic communication between Jesus Enrique Palomera and other "Target Subjects" including the defendant, Tyler Watson.[1] (Gov. Ex. 1.) The Title III affidavit stated that Palomera had continued to operate a drug trafficking operation from prison and had been communicating with individuals in the Treasure Valley about the distribution of controlled substances. *Id.* at 3. The affidavit named Defendant Tyler Watson as one of those individuals. *Id.*

The DEA along with members of the Nampa Police Department ("NPD") Special Investigation Unit ("SIU"), including Task Force Officer ("TFO") Michael Coronado, monitored the wiretap on Palomera's phone during May 2022. The wiretap revealed that Defendant and Palomera had texted on several occasions regarding topics suggesting drug and money deliveries.[2] (Gov. Ex 2. at pg. 5.) Based on this evidence, on June 7, 2023, SIU planned an operation to pull Defendant over and search his car and residence for suspected controlled substances. Before the operation began, NPD Patrol Officer Jared Scott, was asked to assist with

---

[1] Palomera is a drug cartel leader that was sentenced, in 2019 in the Western District of Washington, to 20 years in federal prison for distributing more than 50 kilos of methamphetamine.

[2] On one occasion, Palomera texted Defendant, "My friend you don't [sic] have anybody that like coke[?]" Defendant responded, "Not enough people, no. But I BADLY NEED SOME OF THAT BLUE POWDER BACK." On another occasion, Palomera texted Defendant, "Hey how much money you have[?]" Defendant eventually responded, "Alright bro, I got 17[.]" Palomera then responded, "Ok i hope you can get more my friens ia goin [sic] to be there tomorrow at 6 in the afternoon[.]" Defendant texted back, "I'll doo [sic] my best, but I average about 15 a week for you, I thought we were doin' pretty good[.]"

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS - 2

the operation. TFO Coronado briefed Officer Scott about Defendant; explained that he was the target of the operation; that Defendant was currently on parole; and that the plan was to conduct a traffic stop to search Defendant's car for drugs.

Later that day, SIU conducted surveillance of Defendant's residence and observed Defendant driving away in a maroon Toyota Scion. (ECF No. 22-6, at 1.) Detective Sergeant Huston advised Officer Scott that Defendant's vehicle had failed to use its turn signal when turning. (ECF No. 22-5, at 1.) Defendant then drove by Officer Scott, at which point, Officer Scott pulled Defendant over.

Officer Scott exited his patrol car and encountered Defendant. (ECF No. 22, Ex. H at 00:00–01:04.) Officer Scott told Defendant that he pulled him over for failing to use his turn signal and asked to see his driver's license. *Id.* After confirming Defendant's address, Officer Scott asked if he could see Defendant's registration and insurance. *Id.* While Defendant was looking for his registration and insurance, Officer Scott asked Defendant several questions including whether Defendant was "on probation or parole?" *Id.* Defendant responded that he was on parole, and Officer Scott said, "Okay, what for?" *Id.* Defendant responded, "possession." Officer Scott asked if Defendant had "been staying clean," and Defendant answered that he had. *Id.* Officer Scott asked whether there were any outstanding warrants for Defendant and if there were any drugs in Defendant's car "that a K-9 would alert to." *Id.* Defendant answered "no" to both questions. *Id.*

Officer Scott then walked back to his vehicle with Defendant's license and registration. *Id*. After checking Defendant's license, Officer Scott radioed dispatch and asked, "Confirming P&P does want him detained and the vehicle searched?" (ECF No. 22, Ex. G at 02:26–03:19.)

Dispatch answered, "Affirmed." *Id.* Officer Scott then received a phone call instructing him to "just go ahead, per PO, detain him and then we'll search his car on behalf his PO and then go that route." *Id.* at 03:32–04:20. Idaho Department of Correction Probation/Parole Officer Craig Landers, who had been assisting with the drug investigation, was the parole officer that had asked for Defendant to be detained. (ECF No. 22-6, at 3.) Officer Landers specifically "requested that [Defendant] be removed from the vehicle" and that there be "a search of his person and vehicle by the Nampa Officers per the 4th Amendment waiver in his current parole."[3] *Id.* Officer Scott then removed Defendant from his vehicle and had him sit in the back of Officer Scott's patrol car. (ECF No. 22, Ex. G at 04:40–06:15.)

Officer Scott then searched Defendant's car with Det. Huston and found empty syringes and two stacks of cash in varying denominations. (ECF No. 22-5 at 1.) Part way through the search, Officer Landers arrived and began searching the car as well. (ECF No. 22, Ex H. at 12:09). Officer Landers spoke to Defendant and told him that Chance Nicholas, his Parole Officer, was on his way and that after the officers were done searching the car, they would search his home as well. (ECF No. 22, Ex. G at 14:57–16:55.) After confirming who was at Defendant's house, Officer Landers asked Defendant, "What are we going to find in the car?" Defendant answered, "You're not going to find anything." Defendant then explained that there were syringes in the car that belonged to his friend. *Id.* After that, the only question Officer Landers asked Defendant was how to unlock the trunk of his car. *Id.* Later, Officer Nicholas

---

[3]As a condition of parole, Defendant had agreed to "consent to the search of my person, residence, vehicle, personal property, and other real property or structures owned or leased by me, or for which I am the controlling authority conducted by any agent of IDOC or a law enforcement officer. I hereby waive my rights under the Fourth Amendment and the Idaho constitution concerning searches." (ECF No. 22-3, at 1.)

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS - 4

arrived and asked Defendant for the passcode to his phone. *Id.* After these questions, the officers continued to search Defendant's car and Officer Scott eventually found fentanyl in two black magnetic boxes attached to the undercarriage of his car. (ECF No. 22-5, at 1; Ex. H, at 14:38.)

After searching Defendant's car, Officer Scott took Defendant to his residence. (ECF No. 22-5, at 1.) Officer Landers conducted a search of Defendant's living area based on his parole agreement and found nothing illegal. (ECF No. 22-6, at 3, 5.) While Defendant's residence was being searched, TFO Coronado, DEA Special Agent Aaron Ferguson, and DEA Intelligence Analyst Shelly Hall arrived at Defendant's residence and spoke to Defendant. (ECF No. 22-6, at 1.) TFO Coronado began by reading Defendant his *Miranda* rights.[4] (ECF. No. 22-6, at 1; Gov. Ex. 3.) Defendant stated that he understood his rights and wanted to speak to TFO Coronado. *Id.* TFO Coronado stated that he was aware that Defendant had hidden drugs at his grandmother's residence. *Id.* Defendant agreed to cooperate with law enforcement and show them where the drugs were hidden. *Id.*

Officer Scott then transported Defendant to his grandmother's residence. *Id.* at 2. Defendant informed TFO Coronado that drugs and money were hidden in the detached garage. *Id.* Defendant's grandmother, Alva Bequeath, consented to law enforcement's request to search

---

[4] Officer Coronado read Defendant his Miranda rights from a standard Miranda Warning card from the Canyon County Prosecutor's Office. The sole modification is italicized below.

(1) You have the right to remain silent.
(2) Anything you may be used against you in the court of law.
(3) You have the right to talk to a lawyer and have them present while you are being questioned.
(4) If you cannot afford to hire a lawyer, one will be appointed to represent you before questioning.
*Do you understand your rights?*

the garage and provided them a key. (ECF No. 22, Ex. J-2.) Defendant then showed TFO Coronado where the drugs and money were hidden in the garage. (ECF No 22-6, at 2.) Law enforcement eventually seized over four and a half kilos of fentanyl, fifty-five grams of methamphetamine, and more than $8,600 cash. (Gov. Ex. 4-5.)

Following the seizure, Defendant agreed to be interviewed at the Nampa Police Department. *Id.* TFO Coronado, SA Ferguson, and Intelligence Analyst Hall were all present. (ECF No. 22, Ex. I at 30:30–32:50.) TFO Coronado began the interview by introducing SA Ferguson and explaining what they hoped to learn from Defendant. Before he let Defendant speak, TFO Coronado said, "well, and so before you begin, you remember your *Miranda* rights, right? I provided those earlier to you while we were talking in the car, correct?" *Id.* Defendant responded, "Mmhm," while nodding his head in agreement. *Id.* TFO Coronado explained that speaking with law enforcement went toward his "cooperation" and his statements would be "taken into consideration" when they spoke to "the prosecutor." *Id.* Officer Coronado asked Defendant, "Does that make sense?" *Id.* And Defendant said, "Yes." *Id.* Defendant's only concern was if other individuals or defendants may find out if he spoke to law enforcement, but even after Officer Coronado stated that what Defendant said may likely be "discoverable," Defendant still decided to speak with law enforcement. *Id.* Defendant then went on to explain his participation in the drug trafficking organization. *Id.*

Shortly after his arrest, Defendant was indicted for one count of possession with intent to distribute fentanyl in violation of 18 U.S.C. § 841(a)(1) and (b)(1)(A). (ECF No. 1.) Defendant now seeks to suppress all evidence obtained by law enforcement on July 7, 2023, including the

drugs and any incriminating statements, arguing that law enforcement violated his Fourth and Fifth Amendment rights. (ECF No. 22-1, at 2.)

## ARGUMENT

I. **Law Enforcement Did Not Violate Defendant's Fourth Amendment Rights by Asking Whether He Was on Parole and then Confirming Whether His Parole Officer Wanted Him Detained and Searched.**

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). In the context of a traffic stop, "justified *only* by a police-observed traffic violation," law enforcement generally may not prolong the stop beyond the time reasonably necessary to complete the stop's mission. *Id.* at 354–55. "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Here, Defendant does not dispute that Officer Scott had reasonable suspicion to initiate a traffic stop based on Defendant's traffic violation. (ECF No. 22-1, at 10.) Rather, Defendant argues that Officer Scott went outside the mission of the traffic stop and unreasonably prolonged the stop by asking Defendant if he was on parole and then confirming with other officers if Defendant should be detained and his vehicle searched. *Id.* at 9.

To be clear, the traffic stop in this case was not "justified *only* by a police-observed traffic violation." *Rodriguez*, 575 U.S. at 350. While law enforcement may have

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS - 7

outwardly justified the traffic stop based on Defendant's failure to use a turn signal, the actual reason for the stop—which was supported by probable cause—was to investigate a suspected drug dealer. For this reason, the mission of the traffic stop was much broader than just investigating a traffic violation, and Officer Scott was permitted to inquire about a broader range of subjects, like Defendant's parole status, without prolonging the stop.

But even if the mission of the stop was constrained to merely investigating a traffic violation, as Defendant suggests, Officer Scott reasonably prolonged the stop based on independent reasonable suspicion from two separate sources. Based on the collective knowledge of all the law enforcement officers involved in the traffic stop, Officer Scott (1) had reasonable suspicion that Defendant was involved in drug trafficking and (2) knew that Defendant was on parole and had waived his right to be free from searches by law enforcement. Under either reason, Officer Scott was justified in extending the stop.

Therefore, Officer Scott's inquiries that are challenged by Defendant were either a part of the stop's mission or they were justified by independent reasonable suspicion. Either way, law enforcement acted reasonably in seizing Defendant, searching his car, and confiscating the fentanyl found therein. The Court need not suppress this lawfully obtained evidence.

### A. The Mission of the Traffic Stop Included Making Inquiries Incident to a Drug Investigation.

*Rodriguez* stands for the general proposition that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350. However, much of *Rodriguez*'s

guidance only applies to traffic stops that are "justified *only* by a police-observed traffic violation." *Id.* (emphasis added). For such stops, *Rodriguez* generally restricts a police officer to making "ordinary inquiries incident to [the traffic] stop." *Id.* at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). "Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citations omitted).

Unlike the facts of *Rodriguez*, the traffic stop in this case was not justified solely by a traffic violation. Indeed, Defendant was not some random individual that Officer Scott pulled over that day; instead, he was the target in a larger drug trafficking investigation. Prior to pulling Defendant over, law enforcement had probable cause to believe, based on a months-long investigation involving a wiretap, that Defendant was involved in the distribution of fentanyl and other controlled substances. Law enforcement had established that Defendant was part of a drug trafficking conspiracy which included convicted drug trafficker Jesus Enrique Palomera. The wiretap revealed communications between Defendant and Palomera discussing drug trafficking. Based on this information, the officers involved in the operation, including Officer Scott, knew that Defendant was a suspected drug dealer and parolee. Therefore, while Officer Scott may have ostensibly pulled Defendant over for a traffic violation, this was not the only purpose for the stop.

For this reason, the mission of the stop was much broader than that of an ordinary traffic stop. While Officer Scott was still required by *Rodriguez* to not "exceed[] the time needed to handle the matter for which the stop was made[,]" *id.* at 350, he was not restricted to the normal inquiries for a traffic violation as outlined in *Rodriguez*. Instead, the mission of the stop

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS - 9

permitted Officer Scott to make more probing inquiries incident to a drug investigation because collectively, investigators had, at minimum, reasonable suspicion to believe that Defendant was involved in drug trafficking activity.

When Officer Scott first encountered Defendant, he requested Defendant's identification and asked if Defendant was on parole. These inquiries were intended to confirm that the individual that Officer Scott had stopped was in fact the target of the operation and a parolee as Officer Scott had originally been informed. After returning to his police car, Officer Scott then radioed the other coordinating officers to confirm that Defendant should be detained, and his vehicle searched. This was also directly related to the purpose of the stop; the plan was always to detain Defendant and search his vehicle for drugs and associated contraband. And because Officer Scott was not leading the operation that day, it was reasonable for Officer Scott to confirm the plan with his superior officers rather than act on his own. For all these reasons, Officer Scott's inquiries did not exceed the scope of the stop's mission, and the fentanyl that law enforcement seized from Defendant's car was lawfully obtained.

### B. Alternatively, Any Extension to the Stop was Justified by Independent Reasonable Suspicion.

An inquiry by an officer during a traffic stop is "permissible only if it was (1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (citing *Rodriguez*, 575 U.S. at 354–55). Here, even if the Court concludes that the original mission of the stop was to merely investigate a traffic violation, Officer Scott had independent reasonable suspicion, based on the collective knowledge of all the officers involved in the investigation. That knowledge justified extending the traffic stop.

First, there was reasonable suspicion to believe that Defendant was involved in drug trafficking. As already explained, law enforcement had conducted a months-long investigation of Palomera's drug trafficking organization in the Treasure Valley. Through this investigation, TFO Coronado learned that Defendant was involved in the drug trafficking organization through electronic communications intercepted between Defendant and Palomera. This information alone was enough to justify extending Defendant's traffic stop to also inquire about Defendant's criminal history and parole status. Indeed, this explains why Officer Scott asked about whether Defendant was on parole, what he was on parole for, and if Defendant was staying clean. These were all questions associated with a stop based on independent reasonable suspicion that Defendant was involved in drug trafficking. As such, an extension of the stop for the purposes of furthering the drug trafficking inquiry was reasonable.

Second, law enforcement also had knowledge that Defendant was on parole. As Defendant acknowledges, suspicionless searches of a parolee by law enforcement do not violate the Fourth Amendment because parolees have a diminished expectation of privacy. *Samson v. California*, 547 U.S. 843, 847 (2006). Here, prior to searching defendant's car, law enforcement had coordinated with parole officers, Craig Landers and Chance Nicholas, and learned that Defendant was on parole and as a condition of his parole, he had waived his right to be free from searches of his vehicle by law enforcement. (ECF No. 22-3.) They also had a well-founded suspicion that Defendant was involved in a drug-trafficking conspiracy, and therefore, a parole search was warranted.

For that reason, this case is distinguishable from *United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008). There, the Ninth Circuit concluded that a "search condition validates a search only if the police had advance knowledge that the search condition applied *before they conducted the search*." *Id.* (emphasis added). Unlike *Caseres*, the law enforcement officers in this case knew of Defendant's search condition before searching his vehicle. As Parole Officer Landers noted in his police report, he had "requested that [Defendant] be removed from the vehicle, detained, and a search of his person and vehicle by the Nampa Officers be conducted per the 4th Amendment waiver in his current parole conditions . . . ." (ECF No. 22-6, at 3.) This is also corroborated by Officer Scott's communications in his vehicle prior to detaining Defendant. Officer Scott radioed and asked, "Confirming P&P does want [Defendant] detained and his vehicle searched?" Moments later, Officer Scott received a call and was instructed that "per PO, detain him and we'll search [Defendant's] car on behalf of his PO." These communications evidence the officers' knowledge both that Defendant was on parole and that his car could be searched for that reason.

Finally, under the collective knowledge doctrine, law enforcement's reasonable suspicion of Defendant's drug trafficking and search condition were imputed to Officer Scott. Reasonable suspicion may be based on the collective knowledge of all officers involved in an investigation. *United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989). This is true "even if some of the information known to other officers is not communicated to the arresting officer." *United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996); *United States v. Bernard*, 607 F.2d 1257, 1267 (9th Cir. 1979). "The accepted

practice of modern law enforcement is that an officer often makes arrests at the direction of another law enforcement officer even though the arresting officer himself lacks actual, personal knowledge of the facts supporting probable cause . . . in such situations, a probable cause determination is based on the collective knowledge of the law enforcement personnel." *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005).

Here, Officer Scott may not have known all the facts supporting the reasonable suspicion of the traffic stop in this case, but investigators with the DEA, Nampa SIU, and Idaho Department of Correction Probation and Parole did. Indeed, TFO Coronado who communicated with Officer Scott about the operation plan earlier in the day, had been involved in the investigation of Defendant's drug trafficking from the start and knew about Defendant's parole status prior to the traffic stop. Therefore, even if Officer Scott lacked some of the facts supporting reasonable suspicion, under the collective knowledge doctrine, he is deemed to have had the requisite knowledge based on the combined knowledge of the other officers involved in the investigation, including TFO Coronado, SA Ferguson, Sgt. Huston, Parole Officer Landers, etc..

This case is therefore also distinguishable from *United States v. Mati*, 466 F. Supp. 3d 1046, 1056 (N.D. Cal. 2020) (holding that asking a driver about their probation status and whether they have a search condition is not part of the mission of a traffic stop to investigate a traffic violation.). There, the officer had no prior knowledge of the defendant or his parole status. Here, however, Officer Scott had been informed prior to the traffic stop that Defendant was a parolee and was suspected of drug-related criminal activity. Officer Scott's inquiry then about Defendant's parole status was just Officer

Scott doing his due diligence and confirming what he had already been told prior to the stop. As such, Officer Scott had independent reasonable suspicion that justified prolonging the stop to ask about Defendant's parole status, and therefore the fentanyl that law enforcement seized following the search was lawfully obtained.

## II. Defendant Knowingly and Voluntarily Waived his Fifth Amendment Protection Against Self-Incrimination.

The Fifth Amendment protects individuals from being "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To preserve this right, law enforcement officers must provide certain warnings to suspects prior to any custodial interrogation as outlined by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). If law enforcement fails to provide the requisite *Miranda* warnings, any incriminating statements or evidence that were obtained as a result thereof may be excluded from use at trial. *Id.* at 500. However, a defendant may waive their right against self-incrimination "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444.

Here, Defendant knowingly and voluntarily waived his *Miranda* rights prior to making any self-incriminating statements. Law enforcement questioned Defendant three times while he was in police custody, but at no point did Defendant make any statements that were *both* unwarned *and* incriminating. The first questions put to Defendant occurred shortly after he was detained. (ECF No. 22, Ex. G, at 14:52–16:53.) Officer Landers asked Defendant several questions including, "What are we going to find in the vehicle?" Although Defendant was not mirandized prior to these questions, his answers were not incriminating, and Defendant accordingly does not seek to suppress them.

However, Defendant did make incriminating statements during the other two instances of questioning: first, when Defendant spoke to TFO Coronado in the police car outside his residence, and second, when TFO Coronado and other law enforcement officers interviewed Defendant at the police station. But prior to making both of these statements, law enforcement had read Defendant his *Miranda* warnings. TFO Coronado indicated in his police report that, after law enforcement had searched Defendant's residence and prior to questioning Defendant, TFO Coronado "read Watson his Miranda Rights directly from a Miranda Warnings card." (ECF No. 22-6, at 1.) Although this interaction was not recorded, Defendant later acknowledged during his interview at the police station that he had been mirandized earlier by TFO Coronado. TFO Coronado asked Defendant if he remembered getting read his Miranda rights earlier in the day and Defendant responded, "Mmhm," and nodded in agreement. (ECF No 22-8, Ex. I, at 31:19–31:30.) Therefore, although the *Miranda* warnings were not recorded, Defendant acknowledged that he had in fact been mirandized.

Defendant's incriminating statements were also made after he knowingly and voluntarily waived his *Miranda* rights. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). Here, the totality of the circumstances establish that Defendant understood his rights and chose to waive them and make uncoerced statements. TFO Coronado's report states that after reading Defendant his *Miranda* warnings, "Watson stated he understood and wanted to speak with TFO Coronado." (ECF 22-6, at 1.) Additionally, at the police station, Defendant was again reminded that he had been read his rights earlier, and again, Defendant chose to speak with law

enforcement. (ECF No 22-8, Ex. I, at 31:19–31:30.) In fact, the only reluctance Defendant expressed in speaking to law enforcement was in the possibility that other criminal defendants may discover that he had spoken to law enforcement—not in the fact that he might incriminate himself. (*Id.* at 31:44–32:41). There is also nothing in the record—nor has it been argued by Defendant—that he ever attempted to invoke his *Miranda* rights. At no point did Defendant attempt to remain silent or ask for an attorney. On the contrary, Defendant answered all questions put to him by law enforcement even after being mirandized.

Finally, there is no evidence that law enforcement coerced Defendant into making incriminating statements. He was given the opportunity to refuse to speak to law enforcement officers, ask for an attorney, and invoke his privilege against self-incrimination. In addition to that, he was in the back of the police vehicle speaking to a TFO, a SA, and an intelligence analyst. There was no parole officer in sight.

Although Defendant was required as a condition of his parole to be "truthful" with his parole officers, (ECF No. 22-3), there is no requirement in the "Agreement of Supervision" that he be *compelled* to answer any law enforcement officers' questions, let alone waive his right against self-incrimination. The Supreme Court has held that a similar parole condition does not burden a defendant's exercise of their Fifth Amendment rights. *See Minnesota v. Murphy*, 465 U.S. 420, 434–39 (1984) (holding that condition requiring probationer to "be truthful to your probation officer" did not deter him from claiming his Fifth Amendment privilege). Indeed, the Ninth Circuit has even explicitly distinguished the condition cited by Defendant in *United States v. Saechao*, 418 F.3d 1073, 1075 (9th Cir. 2005), from the probation condition in *Murphy* that is similar to Defendant's parole condition. *United States v. Rodriguez-Rodriguez*, 441 F.3d 767,

773 (9th Cir. 2006) ("Rodriguez-Rodriguez is not subject to a condition like the one found impermissible in *Saechao* requiring him to answer all reasonable inquiries; he is not even subject to a condition like the one found permissible in *Murphy* requiring him to be truthful in all matters."). Therefore, Defendant knowingly and voluntarily waived his *Miranda* rights by choosing to make incriminating statements after he had been read his rights, and the Court should not suppress the statements and evidence law enforcement obtained as a result.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny Defendant's Motion to Suppress.

Respectfully submitted this 18th day of April, 2023.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:

*/s/ David J. Morse*
DAVID J. MORSE
Assistant United States Attorney

*/s/ Daniel Fredrickson*
DANIEL FREDRICKSON, Legal Extern
Under Idaho Bar Commission
Rule 226