Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 806-9663
chd@fergusondurham.com
ISB No. 6428

Attorney for Defendant Watson

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>v.<br><br>TYLER JAY WATSON,<br>　　　　　　Defendant. | Case No. 1:22-cr-00149-BLW<br><br>**REPLY TO RESPONSE TO MOTION TO SUPPRESS** |

Tyler Watson relies on the arguments in his opening memorandum in support of his motion to suppress. But he will take this opportunity to reply to a few issues raised by the Government's response.

1

## I.

**Regardless of whether the Court looks at just what Officer Scott knew, or whether it resorts to the "collective knowledge doctrine," Officer Scott's prolonged detention of Mr. Watson was unlawful.**

The Government argues that "while law enforcement may have outwardly justified the traffic stop based on Defendant's failure to use a turn signal, the actual reason for the stop—which was supported by probable cause—was to investigate a suspected drug dealer." Gov't Resp., p. 8. The Government appears to concede that the traffic violation was a pretext for a different investigation. There remain factual questions to be resolved regarding what Detective Coronado or other officers told Officer Scott about their drug investigation, what Officer Scott knew about Watson's parole status and search waiver, and when he knew those things. Even under the Government's current theory, however, Officer Scott still lacked the requisite cause to justify detaining Watson.

The total of what Officer Scott allegedly knew about Watson and his connection to drug trafficking is described by the Government as: "TFO Coronado briefed Officer Scott about Defendant; explained that he was the target of the operation; that Defendant was currently on parole; and that the plan was to conduct a traffic stop to search Defendant's car for drugs." Gov't Resp., pp. 2-3. Missing are any specific factual details of the "operation" and Watson's role in it. If the Court were to focus just on what

2

Officer Scott knew, this information is woefully inadequate to give him probable cause or reasonable suspicion to detain Watson and "search [his] car for drugs."

"A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime *is present*." *Florida. v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up and citations omitted) (emphasis added). Even under a reasonable suspicion standard, "[r]easonable suspicion 'is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained *is engaged in criminal activity*.'" *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir.2002) (quotation omitted and emphasis added). That is, an officer must have a reasonable belief that crime is then occurring or is about to occur or that evidence of a crime will be found. Based on the description provided in the Government's memorandum, Officer Scott had no specific and articulable facts available to him on which he could have formed a reasonable belief that contraband or evidence of a crime was present in Watson's car.

Shifting away from Officer Scott, the Government falls back on the "collective knowledge doctrine." Gov't Resp. pp. 12-14. Per that doctrine, courts can determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by assessing the "collective knowledge of all the officers involved in the criminal investigation." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).

3

The doctrine has important limitations, however, as it seeks to "distinguish[ ] officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *Ramirez*, 473 F.3d at 1032 (quoting *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005)). It applies in two situations. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). First, when officers "are working together in an investigation but have not explicitly communicated the facts each has independently learned." *Id*. (quoting *Ramirez*, 473 F.3d at 1032). And, second, when an officer "with direct personal knowledge of all the facts necessary to give rise to ... probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Ramirez*, 473 F.3d at 1033 (emphasis in original).

Neither is inapplicable here, as Officer Scott was not "working together in an investigation" with the DEA task force or the Special Investigation Unit in any meaningful sense. Though he apparently was asked to assist that day, he was a patrol officer who was briefed in the broadest of terms about the investigation and the task force's plans. And the instruction to stop Watson came from Detective Huston, not Coronado or others, after he allegedly saw Watson fail to indicate a turn.

But even if the collective knowledge doctrine does apply, the information imputed to Officer Scott is only as good as what was known to those involved in the drug investigation. The Government relies on an affidavit for a warrant related to

4

Watson's phone to sketch out what they knew about him. Gov't Resp., p. 2-3. There, a DEA agent indicates that the task force was investigating someone in federal prison, J. Palomera, who they suspected was organizing drug distribution in Idaho. *Id*. A phone number associated with Watson, among others, cropped up on intercepted phone communications with Palomera, which included some text exchanges between Palomera and that number discussing what appeared to be drugs and prices. Additionally, two unidentified sources told police that Watson was "a distributor of fentanyl and methamphetamine" and gave them Watson's phone number. Dkt. 31-1, p. 5.

What is missing are any specifics or corroboration. While this might have put Watson on the task force's radar, it did not give them probable cause – or even reasonable suspicion – to believe that Watson was ferrying drugs *in his car at the time and place* that he was stopped and detained. The evidence was exceptionally vague, lacking details in time, place, or manner. There were no controlled buys of Watson. Surveillance had unearthed no incriminating facts. Neither the text messages nor the confidential tipsters suggested that Watson transported drugs in the car that was stopped. They didn't know where he was going, and officers had no information about where any drugs might be stored. They had a hunch, based on bits and pieces of information, that Watson was involved. That's it. Presumably, that is why they manufactured a pretext to stop him.

5

"The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). Even under a lower reasonable suspicion standard, a brief stop and investigation is justified precisely because the officer has particularized cause to believe that criminal activity is "afoot" at the time. *See Terry v. Ohio*, 392 U.S. 1, 30 (finding that "it was necessary for the protection of [the officer] and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized.").

Here, the officers lacked any specific reason to believe that Watson was committing a crime as he was driving down a residential street about mid-day in early June, or that evidence of a crime would be found in his car at the moment that they decided to pull him over. And nothing in Scott's brief initial interaction with Watson would have given him reasonable suspicion to investigate further. The warrantless stop and prolonged detention to fish for evidence were therefore unreasonable.

As to whether the detention and search can be justified by a waiver in Watson's parole conditions, the Government still must prove that Officer Scott knew that Watson had a waiver condition, not just that Watson was on parole. *E.g.*, *United States v. Caseres*, 533 F.3d 1064, 1075-76 (9th Cir. 2008) (citing *Samson*, 547 U.S. at n.5, for the proposition that an officer who lacked prior knowledge of search condition would be acting

unreasonably in searching a parolee). Watson did not consent to a prolonged seizure of his person by a police officer while that officer waited to get the okay for a search.

II.

**Even if the initial detention and car search complied with the Fourth Amendment, the Government cannot establish that Mr. Watson knowingly and voluntarily waived his Fifth Amendment privilege against self-incrimination or that his subsequent incriminating statements were voluntary.**

The Government next contends that Watson knowingly and voluntarily waived his *Miranda* rights and that his statements thereafter were not coerced. Gov't Resp., pp. 14-17. It emphasizes that Detective Coronado "read Watson his Miranda Rights directly from a Miranda warnings card," and that Watson "stated he understood and wanted to speak with TFO Coronado." Gov't Resp., p. 15 (quoting Coronado's report). Because this exchange was not recorded, we don't yet know the full factual details. But even if the exchange occurred precisely as Coronado has reported, the Government's argument overlooks several additional coercive aspects of the encounter.

Watson had been handcuffed in the back of Scott's patrol car for the entire time that his own car was searched, which took about 30 minutes. He was then driven to his mother's home and remained in the car while Parole Agent Landers searched the home. For that period he had been completely under the custody and control of numerous law enforcement agents, which is "inherently coercive." *Miranda v. Arizona*, 384 U.S. 436, 467

7

(1966). The Government glosses over the close involvement of P&P and the coercion that added to the situation. It acknowledges that parole agents had already questioned Watson without advising him of his rights, but it brushes that aside because Watson made no incriminating statements. Gov't Resp., p. 14. Watson's failure to make incriminating statements misses the point. Those pre-interrogation and unwarned interactions are particularly relevant because they sent a message to Watson that he had no choice but to cooperate. Parole Agent Landers told him as much: "after we're done searching your vehicle, we're going to take you back to your house and we're going to search your house." Ex. G, 15:11-13. This set the tone.

Agent Landers then did just that. Watson's supervising agent, Nichols, was also present for the search. Whether a parole agent was physically present at the precise moment that Detective Coronado went to the patrol car and spoke to Watson is immaterial. Watson knew that parole agents were working jointly with these uniformed officers.

That is why the lack of a free and voluntary choice is reinforced by the first condition in Watson's Agreement of Supervision with P&P. There, he was ordered to "cooperate with the requests of his probation/parole officer," and that "cooperation includes being truthful." Dkt. 22-3.[1] Watson knew that if he violated any condition of

---

[1] A similar condition was also included in the Parole Commission's separate paperwork releasing Watson on parole, where the Commission instructed him that he "must submit a complete and truthful report to the assigned parole officer." Dkt. 22-4.

8

his release, including the one that he cooperate, the Parole Commission retained the power "to cause the parolee to be returned to an institution to serve the full maximum sentence or any part thereof." Dkt. 22-4.

The Government distinguishes Watson's cooperation condition from a similar one that the Ninth Circuit found coercive in *United States v. Saechao*, 418 F.3d 1073, 1075 (9th Cir. 2005). Gov't Resp., p. 16. It argues that this case is closer to *Minnesota v. Murphy*, 465 U.S. 420 (1984), where the Supreme Court found no coercion in a condition that required a probationer to be "truthful." *Id*. The Court should not be persuaded.

*Murphy*'s holding turned on the fact that the defendant had not been put into a classic penalty situation where the invocation of a constitutional right would subject him to "economic or other sanctions." 465 U.S. at 435. The *Murphy* Court wrote that "[t]he result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution." *Id*. at 435. The defendant in *Murphy* also had not shown the invocation of his right to silence would have subjected him to a sanction like the revocation of probation. *Id*.

In *Saechao*, on the other hand, the probationer was required to "truthfully answer all reasonable inquiries," and the failure to do so could result in revocation. *Id*. at 1075. The Ninth Circuit concluded that, unlike *Murphy*, the condition that the defendant "answer all reasonable inquiries" was coercive and put him in a classic penalty

9

situation: answer the questions or face potential imprisonment. *Id*. at 1081.

That is equally true here. While Government correctly points out that Watson was required to be "truthful" – similar to the condition in *Murphy* – it overlooks that Watson was further required to "cooperate" with agents' "requests." Remaining silent is not "cooperation." Unlike *Murphy*, choosing to remain silent in the face of questioning *would* be a violation of his parole. Also unlike *Murphy*, he was informed that a parole violation would empower the Commission to send him back to prison.[2] Dkt. 22-3, 22-4.

**CONCLUSION**

The Court should grant Watson's motion to suppress.

Respectfully submitted on this 9th day of May 2023.

/s/Craig H. Durham
Attorney for Defendant

---

[2] That Coronado may have read a *Miranda* card to Watson does not alter the analysis. The Fifth Amendment is "self-executing" when a defendant is placed in the classic penalty situation. *See United States v. Bahr*, 730 F.3d 963, 966 (9th Cir. 2013) ("Although Bahr did not assert his Fifth Amendment right against self-incrimination at the time of the disclosures, that right is self-executing where its assertion 'is penalized so as to foreclose a free choice.'" (citing *Murphy*, 465 U.S. at 434).

10

## CERTIFICATE OF SERVICE

I hereby certify that, on May 9, 2023, I filed the foregoing electronically through the CM/ECF system, which caused the parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

David Morse
david.morse@usdoj.gov

Attorney for the United States

/s/Craig H. Durham