UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>TYLER JAY WATSON,<br><br>Defendant. | Case No. 1:22-cr-00149-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Tyler Jay Watson's motion to suppress (Dkt. 22). The Court held an evidentiary hearing on September 6, 2023, and the parties submitted closing briefs on September 15, 2023. For the reasons that follow the Court will deny the motion.

## BACKGROUND

In May 2022, the Drug Enforcement Administration together with Special Investigations Unit ("SIU") of the Nampa Police Department were investigating a drug trafficking operation run by Enrique Jesus Palomera. *Response* at 2, Dkt. 31. As part of this investigation, the DEA received a warrant to intercept communications between Mr. Palomera and several "target suspects" including the

**MEMORANDUM DECISION AND ORDER - 1**

Defendant, Tyler Watson. Gov. Ex. 1, Dkt. 31-1. In these intercepted communications, Mr. Palomera and Mr. Watson texted about delivering large amounts of cash on a weekly basis. *Response* at 2 n.2, Dkt. 31. Based on these communications and information from a confidential informant, the DEA and the SIU planned an operation to pull over Mr. Watson and search his car and residence pursuant a parole condition "waiv[ing] the constitutional right to be free from such searches." *Id.* at 2; *IDOC Agreement of Supervision*, Def. Ex. B, Dkt. 22-3.

Before the operation, the SIU held an operational briefing with the individuals involved in the investigation, including parole and probation Officer Craig Landers and Task Force Officer Michael Coronado. The morning of the planned operation, Nampa Police Officer Jared Scott was asked to assist with the operation and was briefed by Officer Coronado. *Response* at 2, Dkt. 31. On June 7, 2023, officers surveilling Mr. Watson's home saw Mr. Watson fail to signal before making a turn. *Id.* at 3. The surveilling officers informed Officer Scott of Mr. Watson's traffic violation and Officer Scott pulled over Mr. Watson. *Id.*

Officer Scott explained to Mr. Watson that he had been stopped for failing to use a turn signal. Def. Ex. H at 0:00–1:04. Officer Scott then returned to his vehicle, where he confirmed with Detective Huston, of the SIU, that parole and probation wanted Mr. Watson detained and his car searched. Def. Ex. G at 3:40–

**MEMORANDUM DECISION AND ORDER - 2**

3:55. Officer Scott told Mr. Watson that his parole officer wanted his vehicle searched before handcuffing him and placing him in the back of the patrol car. Def. Ex. H at 3:20–3:21. A few minutes after Officer Scott began searching Mr. Watson's car, Officer Landers arrived and assisted in the search of the car. *Id.* at 11:09. During the search, Officer Landers and Mr. Watson's parole officer, Chance Nicholas, spoke with Mr. Watson while he was detained in the back of the patrol vehicle. Def. Ex. G at 14:55–16:55; Ex. E at 5, Dkt. 22-6. The officers eventually found drug paraphernalia as well as two small magnetic boxes attached to the frame of the car containing pills and powder that later tested positive for fentanyl. Def. Ex. D. at 1, Dkt. 22-5.

The officers next searched Mr. Watson's residence where they did not find any contraband. Ex. E at 1, Dkt. 22-6. After the search, Officer Coronado spoke with Mr. Watson while he was still handcuffed in the back of the patrol car. *Id.* at 3. Officer Coronado read Mr. Watson his *Miranda* rights off a card on his phone before questioning him. *Id.* When asked if the officers would find drugs at his grandmother's house, Mr. Watson confirmed they would. *Id.*

The officers then drove to Mr. Watson's grandmother's house and obtained her consent to search the garage. *Id.* at 2. At the officers' request, Mr. Watson showed the officers where the drugs were hidden. *Id.* Officer Scott brought Mr.

**MEMORANDUM DECISION AND ORDER - 3**

Watson back to the police station where Officer Coronado again interviewed Mr. Watson. Def. Ex. D at 1, Dkt. 22-5. At the beginning of the interview, Officer Coronado asked: "Before you begin, you remember your *Miranda* rights, right? I provided this to you earlier today when we were talking in the car, correct?" Def. Ex. I at 31:24–47. Mr. Watson expressed concern that information he provided would be used in a report, but indicated he understood and remembered his rights. *Id.* at 31:47–32:00. During the interview Mr. Watson made several incriminating statements.

Mr. Watson was subsequently indicted for one count of possession with intent to distribute fentanyl. *Indictment*, Dkt. 1. He now asks the Court to suppress the statements he made to the officers as well as the physical evidence found in his car and at his grandmother's house. *Motion*, Dkt. 22.

## LEGAL STANDARD

When a defendant contends the government obtained evidence in violation of the Constitution, the government, as the proponent of the evidence, must prove its admissibility by a preponderance standard. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Cales*, 493 F.2d 1215, 1216 (9th Cir. 1974) (holding proper standard for motion to suppress is preponderance of the evidence, not reasonable doubt).

**MEMORANDUM DECISION AND ORDER - 4**

# ANALYSIS

Mr. Watson claims his Fourth and Fifth Amendment rights were violated and, thus, the statements and evidence obtained by law enforcement on June 7th must be suppressed. The Court will first address Mr. Watson's Fourth Amendment claim seeking the suppression of evidence found in his car before turning to his Fifth Amendment argument to suppress his statements to law enforcement and the physical evidence found in his grandmother's garage.

### A. Fourth Amendment Claim

Mr. Watson moves to suppress the evidence found in his car because it was obtained pursuant to an unlawful search. Although Mr. Watson was initially stopped for a traffic violation, as the Court indicated at the suppression hearing, the traffic violation itself is largely irrelevant to the current analysis. An officer conducting a traffic stop is limited "to address[ing] the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The stop here clearly exceeded that limited scope. Instead, the search is justified by both the existence of independent probable cause and Mr. Watson's parole condition.

#### 1. Probable Cause

The Fourth Amendment protects citizens from unreasonable searches and seizures. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). A

warrantless search is presumptively unreasonable unless one of a limited number of exceptions applies. *United States v. Faagi*, 869 F.3d 1145, 1150 (9th Cir. 2017). One such exception is the "automobile exception" which permits warrantless searches of automobiles based upon the existence of "probable cause to believe that the vehicle contained evidence of a crime." *California v. Acevedo*, 500 U.S. 565, 569 (1991) (citing *Carrol v. United States*, 267 U.S. 132, 151 (1925)). "Probable cause to search exists when the known facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found." *United States v. Ibarra*, 345 F.3d 711, 715 (9th Cir. 2003). Probable cause is "evaluated in light of the totality of the circumstances," *United States v. Pinela-Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001), and "may be based on the collective knowledge of all the officers involved in the investigation." *United States v. Jensen*, 425 F.3d 698, 705 (9th Cir. 2005) (internal quotations and citation omitted).

Based on the collective knowledge doctrine, probable cause existed to search Mr. Watson's car. The collective knowledge doctrine applies is two situations: "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned" and "where an officer (or team of officers), with direct personal knowledge of *all* the facts

necessary to give rise to [probable cause] directs or requests that another officer. . . conduct a stop, search, or arrest." *United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007). The second situation applies here. Members of the SIU directed Officer Scott to stop and search Mr. Watson's car. Officer Coronado gave the initial instructions before the operation began and Detective Huston directed Officer Scott during the operation. Officer Coronado and Detective Huston were members of the SIU and both officers were present at the operational briefing where information about Mr. Watson was shared with those participating in the operation.

    Here, the SIU officers had direct knowledge of the facts that give rise to probable cause. The officers knew of Mr. Watson's involvement with Mr. Palomera because Officer Coronado had monitored the wiretap and seen communications between the two about delivering large amounts of money, coke, and "blue powder." *Response* at 2 n. 2, Dkt. 31. Officer Coronado also received information from multiple confidential informants that Mr. Watson was dealing narcotics, that he stored them at his grandmother's house, and transported them in magnetic boxes in and under his vehicle. Taken together, these facts suggest that Mr. Watson was involved in Mr. Palomera's drug trafficking scheme and that his participation occurred, at least in part, while in his car. These facts, known to the

SIU before June 7th, indicate that was a "fair probability" that evidence of a crime would be found in Mr. Watson's car. *Pinela-Hernandez*, 262 F.3d at 978 (Probable cause for a search exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place.").

To be sure, the investigators could have gathered more information about Mr. Watson, as the defense suggests, by conducting trash pulls, controlled buys, or additional surveillance. But that is not what the law requires. "Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt." *Wartson v. United States*, 400 F.2d 25, 27 (9th Cir. 1968) (internal quotation marks omitted). Under the totality of the circumstances, there is sufficient evidence that the SIU had probable cause to believe Mr. Watson's car would contain evidence of drug trafficking.

### 2. Parole Search Condition

Even absent probable cause, the search of Mr. Watson's car was permissible as a search pursuant to a parole condition. "[A] suspicionless search is lawful if authorized by a parolee's search condition." *United States v. Cervantes*, 859 F.3d 1175, 1183 (9th Cir. 2017). A search pursuant to a search condition will be valid so long as the "law enforcement officer [has] probable cause to believe that a person

is on active parole before conducting a suspicionless search. . . pursuant to a parole condition." *United States v. Estrella*, 69 F.4th 958, 972 (9th Cir. 2023). The officer must also have "advance knowledge of an applicable parole condition before they may detain or search a parolee." *Id.* "That knowledge must be particularized enough for the officer to be aware that a parole condition applies and authorizes the encounter." *Id* (citing *United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008)).

Here, the officers involved in the investigation knew of both Mr. Watson's parole status and the existence of the search waiver. Prior to the operation on June 7th, Officer Coronado and Detective Huston attended an operational briefing where Officer Landers confirmed Mr. Watson was still on parole and subject to a Fourth Amendment waiver. Officer Coronado testified that he also communicated this information to Officer Scott. Officer Scott's knowledge, both directly and through the collective knowledge doctrine, satisfies the probable cause requirement. Accordingly, the evidence from Mr. Watson's vehicle will not be suppressed.

### B.     Fifth Amendment Claim

Mr. Watson also moves to suppress statements and physical evidence he argues was obtained in violation of the Fifth Amendment. He argues the statements

he made to law enforcement were unwarned and involuntary and that the evidence at his grandmother's house must be excluded as physical fruits of these unwarned and involuntary statements.

### 1. Adequacy of *Miranda* Warning

Mr. Watson argues that Officer Coronado did not adequately advise him of his rights, so his statements were obtained in violation of *Miranda*. The parties agree that Mr. Watson was in custody when he was questioned by Officer Coronado. *Motion* at 19, Dkt. 22-1; *Response* at 15, Dkt. 31. "The Supreme Court has made clear that no 'talismanic incantation' of this warning is necessary to satisfy the strictures of *Miranda*." *United States v. Connell*, 869 F.2d 1349, 1351 (9th Cir. 1989) (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981)). "The [relevant] inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Doody v. Ryan*, 649 F.3d 986, 1002 9th Cir. 2011) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)).

Here, Officer Coronado adequately conveyed to Mr. Watson his rights. Officer Coronado testified that he read the *Miranda* warning from a picture of a card provided by Canyon County prosecutors. The card lists an individual's rights while in custody as required by *Miranda*. Mr. Watson indicated he understood the rights as read to him in the patrol car at the time Officer Coronado advised him of

**MEMORANDUM DECISION AND ORDER - 10**

those rights and later reiterated this understanding at the police station. The lack of a recording or written waiver does not affect the adequacy of the warning. Officer Coronado adequately advised Mr. Watson of his rights consistent with the requirements of *Miranda*.

Mr. Watson further claims that his statements made to the officers at the police station should be suppressed because he was not properly re-advised of his rights. The Court disagrees. "[C]ourts have generally rejected a per se rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995). "A rewarning is not required simply because there is a break in questioning." *Territory of Guam v. Dela Pena*, 72 F.3d 767, 770 (9th Cir. 1995).

Here, there was simply a break in questioning. Officer Coronado read Mr. Watson his rights while he was detained in the back of the patrol car. When asked if he remembered these rights at the station, Mr. Watson confirmed he did. He did not express any concerns or confusion about his rights or the previous warning. The few hours that passed between Officer Coronado advising Mr. Watson of his rights and the interview at the police station is insufficient to require readvisement. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128–29 (2005) (requestioning that occurred one day after initial *Miranda* warning did not require

MEMORANDUM DECISION AND ORDER - 11

a second warning). As such, Mr. Watson was properly advised of his *Miranda* rights.

### 2. Penalty Situation

Mr. Watson argues his statements were involuntary because they were compelled by a condition of his parole. In general, the Fifth Amendment's privilege against self-incrimination applies only to those who "claim it." *United States v. Saechao*, 418 F.3d 1073, 1077 (9th Cir. 2005). This general rule, however, does not apply when an individual is "denied the free choice to admit, to deny or to refuse to answer." *Id.* An individual is denied this choice when the government creates a "penalty situation." *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984). A penalty situation occurs when "an individual's refusal to answer incriminating questions subjects him to a penalty." *Saechao*, 418 F.3d at 1077. In these situations, the privilege becomes "self-executing" such that even if the individual does not invoke the privilege, their statements are inadmissible. *Id.*

At the heart of Mr. Watson's claim is a probation condition that states, in relevant part: "I will cooperate with the requests of my probation/parole officer. Cooperation includes being truthful. If I am detained by law enforcement, I will tell the officer(s) that I am on felony supervision, and the name of my probation/parole officer." *IDOC Agreement of Supervision*, Def. Ex. B., Dkt. 22-3.

**MEMORANDUM DECISION AND ORDER - 12**

The Agreement of Supervision clearly states that failure to "abide by and conform to" the conditions "may result in the submission of a report of violation to [the parolee's] sentencing/paroling authority." *Id.*

Both the Supreme Court and the Ninth Circuit have recognized the potential for this type of parole condition to create a penalty situation that runs afoul of the Fifth Amendment. *Murphy*, 465 U.S. at 427 ("There is thus a substantial basis in our cases for concluding that if the state, whether expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answer would be deemed compelled and inadmissible in a criminal prosecution."); *Saechao*, 418 F.3d at 1081 ("If, by virtue of its probation conditions, a state expressly or *implicitly* penalizes the exercise of the right to remain silent, then the probationer's answers to incriminating questions posed by probation officer are deemed compelled and are inadmissible in ensuing criminal proceedings." (emphasis in original)).

To be sure, not every probation condition requiring some form of truthfulness or cooperation creates a penalty situation. "[I]n order for a court to determine whether a probationer is subject to a penalty situation, it must inquire whether [his] probation conditions merely required him to appear and give

**MEMORANDUM DECISION AND ORDER - 13**

testimony about matters relevant to his probationary status or whether they went further by taking the extra, impermissible step of requiring him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Saechao*, 418 F.3d at 1078 (internal quotations and citation omitted).

In *Murphy*, the Supreme Court held that a condition requiring the defendant to "be truthful with his probation officer in all matters" did not render an otherwise voluntary statement involuntary. 465 U.S. at 427, 436. This result hinged on the fact that there was no penalty for remaining silent as revocation only occurred if the defendant failed to "be truthful" when he did choose to speak. *Id.* at 438. In *Saechao*, the Ninth Circuit concluded that Oregon's condition requiring a probationer to "promptly and truthfully answer all reasonable inquiries by Department of Correction or County Community Correction Agencies" did create a penalty situation because staying silent could result in revocation of probation. 418 F.3d at 1075.

IDOC's parole condition falls somewhere between the conditions in *Murphy* and *Saechao*. Unlike in *Murphy*, the condition does not merely require truthfulness, and unlike in *Saechao*, it does not explicitly require answers to all inquiries. Instead, the condition requires "cooperation" which the Agreement

**MEMORANDUM DECISION AND ORDER - 14**

stipulates includes truthfulness. "An order to 'cooperate' demands more of a reasonable [parolee] than an order merely to be 'truthful.' . . . At the same time, it does not *clearly* communicate that the [parolee] must 'answer all' questions." *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1029 (D. Or. 2014) (holding a regulation requiring federal employee to cooperate with investigations created a penalty situation) (internal citations omitted). Instead, it threatens "by implication" that the failure to answer questions or comply with requests will result in revocation of parole. *Saechao*, 418 F.3d at 1079 (emphasizing that "a state creates a classic penalty situation if it 'expressly or *by implication*' suggests that the invocation of the privilege would lead to revocation of probation." (quoting *Murphy*, 465 U.S. at 435)). The Agreement of Supervision specifically states that failure to adhere to the conditions could result in revocation proceedings. *IDOC Agreement of Supervision*, Def. Ex. B., Dkt. 22-3. The parole condition, then, operates more like the condition in *Saechao* than the condition in *Murphy* because failing to answer would provide "grounds for revocation." *Id.* In doing so, it "tak[es] the extra impermissible step of requiring [the parolee] to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 1078.

      Simply put, Mr. Watson certainly would have been subject to a "classic

**MEMORANDUM DECISION AND ORDER - 15**

penalty situation" if the incriminating statements were made to his parole officer. Mr. Watson's statements, however, were not made to his parole officer, but to Officer Coronado, a task force officer, after he administered *Miranda* warnings. Mr. Watson's parole condition only mandated cooperation "with the requests of [his] probation/parole officer," not all law enforcement. *IDOC Agreement of Supervision*, Def. Ex. B., Dkt. 22-3. The *Miranda* warning and the fact that the statements were made to law enforcement, not a parole and probation officer, distinguishes this case from both *Saechao* and *Murphy*. These two facts, taken together, remedy the coercive effect of the parole condition.

This conclusion is not based solely on the fact that Officer Coronado was not a parole and probation officer. The Court in *Murphy* recognized that "[a] different question would be presented if he had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting" even where the parole condition only required truthfulness with one's probation officer, not all law enforcement. *Murphy*, 465 U.S. at 430 n.5. Indeed, the close relationship between parole and probation and law enforcement here illustrates how this parole condition may create a penalty situation even if the interviewer is not a parole officer.

At the outset of the interaction, Officer Scott told Mr. Watson he was to be

MEMORANDUM DECISION AND ORDER - 16

detained and searched at the direction of parole and probation. Officer Landers, from parole and probation, told Mr. Watson "after we're done searching your vehicle, we're going to take you back to your house and we're going to search your house." Def. Ex. G at 15:11–13. The interview occurred in the back of the patrol car where Mr. Watson was initially detained for a parole compliance check while officers searched his home, ostensibly as part of that compliance check. Officer Scott, who previously told Mr. Watson he was acting pursuant to parole and probation's request, continued to escort Mr. Watson until he arrived at the police station. Conducting the search of Mr. Watson's car and house as a parole compliance check obscured the true purpose of the search for evidence of alleged drug trafficking. This obfuscation could easily result in confusion about Mr. Watson's obligation to cooperate.

This confusion is entirely of the government's own making. By relying on the parole condition to conduct the searches, rather than obtaining a warrant, the officers muddied the water between the investigation and the parole compliance check. The integration of parole and probation with law enforcement investigations inevitably creates confusion about the parolee's obligations. This is all the more true when it's unclear where the compliance check ends, and the investigation begins. Even if the government has managed to thread the needle this time, the

**MEMORANDUM DECISION AND ORDER - 17**

confusion and risk of coercion is apparent.

That said, Officer Coronado did administer a *Miranda* warning before speaking with Mr. Watson. The *Miranda* warning, alone, may not negate the coercive effect of the probation condition. "Informing a suspect who is [subject to a condition requiring cooperation] that he has the right to remain silent does not communicate that he may exercise that right without forfeiting" his provisional freedom. *Goodpaster*, 65 F. Supp. 3d at 1032 (citing *Garrity v. State of New Jersey*, 385 U.S. 493, 499 (1967)). The concern identified in *Goodpaster* is equally salient when the individual is a parolee rather than a federal employee.

Here, however, the context is different enough that this concern is mitigated. The *Miranda* warning combined with the fact that Officer Coronado is not Mr. Watson's parole officer is sufficient to signal that the nature of the interaction had changed from a parole compliance check to some kind of investigation. Officer Coronado did not imply that the parole condition applied during the conversation or that Mr. Watson would be punished for staying silent. Indeed, none of the officers, including the parole and probation officers, even mentioned the existence of the parole condition when talking to Mr. Watson. Mr. Watson was advised of his rights and he was not talking to his parole officer. Under these circumstances, Mr. Watson was not subject to a penalty situation that rendered his statements

involuntary. Therefore, neither his statements nor the physical evidence from his grandmother's will be suppressed.

## ORDER

**IT IS ORDERED** that Defendant's Motion to Suppress (Dkt. 22) is **DENIED**.

DATED: October 13, 2023

_____
B. Lynn Winmill
U.S. District Court Judge